UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROCKY WISNESKI, et al.,

        Plaintiffs,

   v.                                        Case No. 03-C-1488

AUTOLOG PRODUCTION MANAGEMENT, INC.,

        Defendant.

## DECISION AND ORDER

This case arises out of a workplace accident at the Wolf River sawmill. Plaintiff Rocky Wisneski's job at the mill involved monitoring a large "greenline" machine, which was used to trim and sort lumber. Occasionally boards running through the machine would become askew, which required an employee to straighten the board out. This could usually be done by reaching the board from a catwalk. Occasionally, however, skewed boards were not reachable from the catwalk and an employee would need to climb onto the machine.

By design, whenever a board became skewed the greenline machine would shut off so as to protect the machine's sorter. Thus, when Wisneski climbed onto the machine three times on January 17, 2002, the machine had already automatically stopped. The first two times went off without incident, but on the third occasion the machine started moving suddenly as soon as he straightened the skewed board. This sudden movement caused him to fall some 20 feet to the ground.

At present all that remains in this lawsuit is Wisneski's case against Autolog Production Management. Autolog was not Wisneski's employer, nor did it manufacture the greenline machine. Instead, it was responsible for the design and manufacture of the greenline machine's control system. Specifically, while other companies designed and manufactured the machine itself and implemented its mechanical and electrical systems, Autolog designed the "brains" of the system, including panel controls and display boards.

The plaintiff's case against Autolog is based on its failure to properly warn and/or instruct end users of its console system. In particular, the system had an emergency "off" button that would shut down the machine until the machine was manually rearmed; thus, it functioned differently than the automatic shut down that occurred whenever a board became skewed. Wisneski, however, apparently did not appreciate the difference. When he stepped onto the machine on January 17, 2002, he assumed that the machine would be stopped until he rearmed it while he was standing at the console switch. He claims that no one ever told him he needed to first press the emergency off button before climbing onto the machine. (PPFOF ¶¶ 64-65.)[1] His particular complaint is that although he knew pressing the stop button would halt a *moving* machine, he was never instructed to press the emergency off button when the machine was *already* stopped. Had he done so, the machine would not have been able to restart while he was still working on it.

Autolog has moved for summary judgment on the grounds that, as a component manufacturer that essentially provided a product based on others' specifications, it should have no

---

[1] "PPFOF" designates Plaintiff's proposed findings of fact. This particular proposed finding of fact is disputed, but for purposes of summary judgment the facts are taken in the light most favorable to Wisneski, the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

2

liability for failing to warn and/or instruct Wisneski. In the plaintiff's view, however, Autolog should have anticipated that mill workers–many of whom would have little formal education–would occasionally need to climb on the greenline machine, and it should therefore have either trained Wisneski better, issued detailed manuals about the console's operation, or at the very least it should have placed prominent warnings on the console itself, such as "Always Press Emergency Stop Button Before Entering Machine." These failures, the plaintiff claims, demonstrate Autolog's "cavalier" attitude towards safety.

**I. Analysis**

There are some genuine factual disputes that, if resolved in the defendant's favor, would probably cinch its case. In particular, the defendant alleges that Wisneski *was* trained and told repeatedly that the emergency button was to be pressed any time he climbed onto the machine. He denies this. But if that proves true, his claim that Autolog failed to warn him about the dangers of a "live" machine will have its legs cut out from underneath. Yet for purposes of summary judgment, I must accept the plaintiff's version of the facts as true and determine whether, as a matter of law, the plaintiff would lose nevertheless. Fed. R. Civ. P. 56. Taking the undisputed facts and other facts in the light most favorable to the plaintiff, I conclude that summary judgment is not warranted.

The central legal dispute is whether Autolog was under any sort of duty to give warnings about potential dangers of the greenline machine. The plaintiff has brought claims under theories of negligence and strict liability, although the two theories are largely indistinguishable in the briefing. Under Wisconsin law, sellers may be required to provide warnings about the proper use of their product:

3

> A warning is required when the seller has "reason to anticipate that danger may result from the particular use . . . and a product sold without such warning is in a defective condition." The warning must be adequate and appropriate under the circumstances. A manufacturer must anticipate the environment that is normal for the use of the product. In other words, the manufacturer has the duty to foresee all reasonable uses and misuses and the resulting foreseeable dangers. The duty to warn arises when the manufacturer has, or should have, knowledge of a dangerous use. An inadequate warning on a product can, by itself, render the design defective. Whether a warning is adequate is generally an issue of fact to be determined by the jury. The jury is to consider all pertinent factors, such as the likelihood of a particular accident taking place and the seriousness of the consequences, in deciding whether the warning is sufficient to apprise the user of the particular hazard.

*Mohr v. St. Paul Fire & Marine Ins. Co.,* 674 N.W.2d 576, 58990 (Wis. Ct. App. 2003)(citations omitted). Thus, whether we are talking about strict liability or negligence, the primary question is what sort of warnings the manufacturer should have given: "[w]ith respect to the adequacy of a warning, the initial inquiry under both strict liability and negligence analyses is the scope of the manufacturers duty to provide a warning." *Kurer v. Parke, Davis & Co.,* 679 N.W.2d 867, 876 (Wis. Ct. App. 2004).[2]

Here, of course, we are dealing not with the manufacturer of the machine from which the plaintiff fell, but the manufacturer of a component of that machine, and that distinction lies at the core of Autolog's motion for summary judgment. It asserts that "Autolog was a component part manufacturer whose product was incorporated into a bigger system - that being the greenline equipment - and had no involvement in or control over the overall design of the equipment or safety issues to be implemented thereon." (Def. Br. at 4.) As such, Autolog claims it simply had no

---

[2]For present purposes, the inquiry into both strict liability and negligence is the same, as the plaintiff does not advance distinct arguments for one or the other theories. There is some confusion in the cases, however, about the different applicable standards. *See Mohr,* 674 N.W.2d at 589-90 n.10.

4

involvement in the design or implementation of any safety features that might have prevented Wisneski's fall. As such, it cannot be liable.

When the relationship between a component manufacturer and the end-user is attenuated, which presumably is common in the workplace scenario, it makes less practical sense to impose a duty to warn or instruct upon the relatively remote (and probably unknown) component manufacturer. In a helpful collection of cases, one commentator has summarized the issue as follows:

> Where . . . the ultimate user of the component part was an employee of the immediate purchaser of the part, the courts have reached different conclusions as to whether the component part manufacturer was under a duty to warn the employee of product-connected danger. Where the immediate purchaser of the component had already been given an adequate warning or otherwise knew of the danger involved, it has been held that no recovery could be had against the manufacturer or seller of the component part on such basis, the courts reasoning that it would be impractical to require the component part manufacturer or seller to warn the individual employees of the purchaser, especially where the individual employees were under the direct supervision of the immediate purchaser's personnel who were already aware of the particular dangers involved, and thus had superior knowledge of the risks presented. Under the circumstances of other cases, however, the component part manufacturer has been held to be under a duty to warn the employees of the immediate purchaser of the component of its dangerous propensities, where it appeared that such dangers were relatively unappreciated or not known by the employer.

39 ALR 4th 6 § 2[a].

But what these distinctions make clear is that the mere fact that one is a manufacturer of a component rather than a whole unit does not *ipso facto* guarantee one has no duty to warn. Thus, although Autolog's protests are well-taken, there are certainly times when the manufacturer of a component can be liable to end-users other than the purchaser. *See, e.g., Mays v. Ciba-Geigy Corp.*, 661 P.2d 348, 365 (Kan.1983)(distinguishing case before it from one involving "the

5

operation of a machine commonly used by low echelon personnel or laborers where a simple warning on the machine may be necessary to advise or remind its users of a particular danger in the use of the machine"). Context counts. The relevant context in this case is that although Autolog was merely a component manufacturer, it was not as though the component it manufactured was not an essential part of the machine that caused plaintiff's injury and unrelated to the accident that occurred. Indeed, by its own account, Autolog manufactured the "brains" of the greenline machine; it manufactured the controls that were used to operate the machine as well as the emergency button that would have prevented the accident that occurred, and the plaintiff's claim is that his failure to properly use the console Autolog manufactured was integral to his injury. Moreover, Autolog was directly involved in the design of the controls, improper use of which allegedly caused the accident. (PPFOF ¶¶ 5-6.) Autolog also trained employees on the proper operation of the controls. (*Id.* ¶ 25.)

Autolog compares this case to *Wenrick v. Schloemann-Siemag Aktiengesellschaft,* where the plaintiff sued the manufacturer of a switch that was a component of a much larger machine. 564 A.2d 1244 (Pa. 1989). The plaintiff's theory in that case was that the switch manufacturer failed to warn about the dangers of an uncovered switch that had been accidentally tripped. The switch manufacturer, the plaintiff's expert claimed, "had a duty to warn SMS AG about the danger posed by the location of the unguarded switch above the steps." *Id.* at 1246. The court rejected that argument, however, stating:

> Wenrick asserts that Cutler-Hammer's duty to warn SMS AG arose from its "substantial participation in the installation of the press . . . its status as the designer of the entire electrical control system and the facts that the unguarded condition of the switch and its location above the access steps was obvious." As noted in the discussion of the strict liability claim, however, Cutler-Hammer's task in designing the electrical control system did not include the physical placement of any mechanisms on the manufactured product. All the decisions and actions whereby

6

the danger was created--the type of switch (unguarded), its location, and the location of the service pit and its access steps--were the responsibility of SMS AG.

*Id.* at 1247.

Because the danger in that case arose from the *location* and *type* of the switch–a decision about which the manufacturer had absolutely no input–the court could say that no liability ensued. Here, however, the claim is that the very nature of the console itself–by having no warnings on it–was what wrongly led the plaintiff to believe the machine was safe. This was something over which Autolog did maintain control. In light of these facts, and given Autolog's admitted familiarity with the skewing problem and the need for employees to climb onto the machine when it occurred (PPFOF ¶ 54), I am unable to say as a matter of law, at least as the record now stands, that Autolog did not have a duty to warn.

Accordingly, the motion for summary judgment is DENIED. The clerk shall set this matter for a Rule 16 telephone conference within the next 30 days to determine further scheduling.

**SO ORDERED** this   21st   day of March, 2006.

                                                    s/ William C. Griesbach
                                                    William C. Griesbach
                                                    United States District Judge